IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MARK TUCKER | § | |
| | § | |
| VS. | § | CA No. _____ |
| | § | |
| UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA | § | |

## PLAINTIFF'S COMPLAINT

MARK TUCKER, Plaintiff, files this Complaint against Unum Life Insurance Company of America due to its wrongful denial of his long-term disability claim.

## I.
## PARTIES

1.    Plaintiff Mark Tucker is a resident citizen of Bastrop, Texas.

2.    Defendant, Unum Life Insurance Company of America, ("Unum"), is a domestic or foreign insurance company licensed to do business and doing business in the state of Texas, and can be served with process by serving its registered agent, Corporation Service Company, 211 East 7th St., Suite 620, Austin, TX 78701-3218 or wherever it may be found.

## II.
## JURISDICTION AND VENUE

3.    This action against Unum arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq*. This Court has jurisdiction over this action pursuant to 29 U.S.C. §1132(e)(1).

4.    If it is determined that the Electricity Reliability Council of Texas Plan does not fall under ERISA, Mr. Tucker reserves the right to remand this matter to state court.

Subject matter jurisdiction can never be waived. *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149 (1908); Fed. R. Civ. Proc. 12(h)(3).

5.   Venue is proper in this District and Division pursuant to 29 U.S.C. §1132(e)(2) because Defendant maintains business activity in and is in this district.

6.   Pursuant to 29 U.S.C. §1132(h), this Complaint has been served upon the Secretary of Labor, Pension and Welfare Benefits Administration, at 200 Constitution Avenue N.W., Washington, D.C. 20210 and the Secretary of the Treasury at 111 Constitution Avenue N.W., Washington, D.C. 20024, by certified mail return receipt requested.

### III.
### STATEMENT OF FACTS

7.   Unum is in the insurance business and sells various forms of life and disability insurance. The promise of disability insurance is to provide income protection if an insured is disabled by injury or sickness.

8.   Implicit in the promise of Unum's policy is that it will timely, fairly, and objectively adjust and pay a covered claim. If in doubt about the cause or nature of the insured's disability, Unum implicitly promises to investigate the claim fairly and objectively and promptly pay if the claim meets the policy requirements.

The Plan and Policy

9.   As a full-time employee at Electricity Reliability Council of Texas ("ERCOT"), Mr. Tucker enrolled in Electricity Reliability Council of Texas Plan ("Plan") that included benefits for long term disability (LTD). The Plan provided income

protection if an employee was disabled because of injury or sickness. Mr. Tucker was an eligible employee.

10.     ERCOT was the employer, Plan sponsor, and Plan Administrator.

11.     Unum is the Insurer of the Policy (Policy No. 417086 002), which was effective on July 1, 2014. The policyholder is ERCOT.

12.     The Policy defines "disability" for the first 24 months as being unable to perform "with reasonable continuity the material and substantial duties of your regular occupation". This is often referred to as "own occ" disability in the insurance industry.

Mr. Tucker's Job

13.     Mr. Tucker was hired in June 2001 by ERCOT as a Lead Network Administrator and involved in the design, installation, and maintenance of over 150 market participant sites nationwide and overseas. He also handled all aspects of maintenance troubleshooting and new turn up activity including the operations, administration, and provisioning of the Tellabs 5320LS DCS, RAD Multiplexers, ADC and Telco systems Channel Banks, Cisco 15454, Cisco Routers, and other related peripheral communications equipment. Mr. Tucker was the primary lead for the installation, upgrade and support of NICE Voice Logger system, Forum Continuum Conference Bridge, IPC Turret Trader Phone systems, and Tellabs 5320LS Digital Cross Connect System. He was also responsible for all technical documentation for these systems.

14.     The job required near constant management of network issues and assisting and directing other team members to resolve issues. Until his disability, he was always able to maintain his composure and logically work to resolve problems.

### Disabling Effects of Long COVID

15.     Unfortunately, Mr. Tucker is afflicted with long COVID. To this day, he has major memory impairment. His mind is like a washing machine, constantly shifting from one thought to another, never letting him focus. He cannot think straight, remember things, or organize like he used to. Although research and information about the effects of long haul COVID is ongoing, we summarize what is already known.

16.     "Long COVID" or "long hauler" patients like Mr. Tucker continue to suffer from many symptoms following their infection. Marshall, M. The lasting misery of coronavirus long-haulers. *Nature*. September 14, 2020 (online publication); Mahase, EM. Covid-19: What do we know about "long covid"? *BMJ*. July 14, 2020 (online publication). About 10 - 15% of cases progress to severe disease, with about 5% remaining critically ill. World Health Organization. *What We Know About the Long-Term Effects of Covid-19*. September 2020.

17.     Risk factors for persisting symptoms include high blood pressure, obesity, and mental health conditions. World Health Organization. *What We Know About the Long-Term Effects of COVID-19*. September 2020. Mr. Tucker falls into some of those risk factors.

18.     Lingering symptoms following COVID-19 infection include fatigue, cough, congestion, shortness of breath, loss of taste or smell, headache, body aches,

diarrhea, nausea, chest or abdominal pain, confusion, memory loss, concentration deficits, insomnia, among other. World Health Organization. *What We Know About the Long-Term Effects of COVID-19*. September 2020; Ross, JM, et al. Summary of COVID-19 long term health effects: Emerging evidence and ongoing investigation. COVID-19 Literature Report Team, State of Washington, Department of Health, September 1, 2020; Ross, JM, et al. Summary of COVID-19 long term health effects: Emerging evidence and ongoing investigation. COVID-19 Literature Report Team, State of Washington, Department of Health, September 1, 2020; Marshall, M. The lasting misery of coronavirus long-haulers. *Nature*. September 14, 2020 (online publication). Vinetz, J. What are the long-term effects of COVID-19? *Medical News Today*. September 29, 2020 (online publication).

19.    In addition, there is an added risk of long-term damage. Evidence strongly suggests that COVID-19 patients are at high risk for development of neurological disease, particularly Alzhemier's disease. Heneka, MT, et al. Immediate and long-term consequences of COVID-19 infections for the development of neurological disease. *Alzhemer's Res Ther*. 2020; 12:69; Public Health Ontario. *Long-Term Sequelae and COVID-19 – What We Know So Far*. July 10, 2020. Long term cognitive effects are expected because of COVID-19 infection. Budson, AEB. The hidden long-term cognitive effects of COVID-19. *Harvard Health Blog*. October, 8, 2020 (online publication).

20.    Mr. Tucker continues to suffer from major memory impairment. It is not presently known how long COVID will affect him cognitively. However, the impact of long COVID, in and of itself, totally disables Mr. Tucker from his own occupation.

The LTD Claim

21.    Mr. Tucker's last day of work was June 3, 2022.

22.    Faye Tucker, Mr. Tucker's wife, helped him apply for short-term disability benefits.

23.    Unum approved the STD claim through December 2, 2022, the maximum benefit period.

24.    Mr. Tucker also applied for LTD benefits.

25.    In July 2022, Thomas Fields diagnosed Mr. Tucker with memory impairment.

26.    On November 3, 2022, ERCOT employee Lori Jendusa contacted Unum to complain that Mr. Tucker was having trouble submitting information to Unum. ERCOT confirmed that he was not able to return to work. Furthermore, if Unum was relying on its employee Dulce Escobar, "she doesn't reply to any of my calls or emails."

27.    On November 28, 2022, Unum employee Pamela Albert noted that Mr. Tucker suffered from senile degeneration and cerebral atherosclerosis.

28.    Later that day, Ms. Albert had a phone conference with Mr. Tucker and Mrs. Tucker. Mr. Tucker explained that he had a high end, technical job. His disability required him to take detailed notes every step of the way, which was uncommon for him. He was observed to pause and ask Ms. Albert to repeat questions several times for comprehension.

29.    On December 5, 2022, Unum medical director Neeraj Gupta claimed that although a Neurotrax test result was abnormal, it could have been influenced by Mr. Tucker's subjective complaints.

30. Three days later, Unum employee asked Dr. Herbert Edmundson, Mr. Tucker's neurologist, "Do you agree that Mr. Tucker is not precluded from his occupational demands"?

31. Dr. Edmundson denied the leading question. He explained that Mr. Tucker had:

> "persistent and worsening of his memory difficulty. He has difficulty performing such simple actions as electrical wiring projects. He Is a Journeyman electrician who has been in this field of work for many years. He is "missing steps" and otherwise simple straightforward processes. He has become increasingly discouraged by the fact that he can no longer "deal with numbers" appropriately. He has been terminated from his job because he was unable to continue to work at his previous level. The difficulty with befuddled mood and memory loss is progressively worsening."

32. On December 20, 2022, Unum employee Monica Grafals claimed that an Insurance Medical Examination of Mr. Tucker was unnecessary because the existence, intensity, frequency, and duration of his symptoms would not preclude him from working.

33. Ms. Grafals accused Mr. Tucker of malingering and exaggerating his disability.

Bias of ECN

34. Next, Unum hired Exam Coordinators Network ("ECN"), who paid Dr. Keren McCarthy to review some of Mr. Tucker's medical records.

35. It is unclear if Dr. McCarthy is an Unum employee. She has not advised the Pennsylvania Department of State as such, and she claims to be an employee of Holy Redeemer Health System. However, there are indicators that Dr. McCarthy is, at minimum, affiliated with Unum. For instance, her December 23, 2022 report is titled "Designated Medical Officer Review Response". The report is littered with lingo from internal Unum documents.

36.    Dr. McCarthy gave the following opinions to Unum:

    a.    Mr. Tucker's job requires skilled work involving making judgments and decisions, dealing with people, attaining precise set limits, tolerances, standards, and attentiveness without loss of efficiency or composure.

    b.    There was no evidence of "symptom regression".

    c.    Mr. Tucker had improvements in his symptoms once he started taking Adderall.

    d.    She "concurs with the opinions expressed by the OSP".

37.    Curiously, Dr. McCarthy did not bother to identify which Unum medical director she agreed with. Similarly, she made no attempt to identify what medical records she reviewed. She lacks the experience necessary to diagnose or treat someone with long COVID.

38.    It is important to understand the connection between Unum and ECN to determine if evidence exists that would encourage reviews to help deny claims. Courts permit the discovery of such evidence. *See Jones v. LICNA*, 2020 U.S. Dist. LEXIS 78730, (N.D. Ariz. May 5, 2020) (court ordered production of times insurer hired ECN to perform medical record reviews, total amount paid to ECN, and 1099's showing payment to ECN). When the insurer provides conflicting physician reports, the credibility, bias, or prejudice of their physicians is relevant. In addition, when a reviewer or third-party vendor either has a longstanding relationship with the insurer or has received substantial compensation and overwhelmingly renders opinions in their favor, evidence of bias is an important consideration.

39.    The same day, Dr. Edmundson advised Unum, "Please review all records, including evaluation from 12/16/22. Patient has significant cognitive impairment". He did not agree with Ms. Grafals' conclusions.

40. On January 6, 2023, Dr. McCarthy claimed that additional medical records proved that Mr. Tucker was improving and that he had no symptoms of regression.

Unum Denies LTD Claim

41. On January 6, 2023, Unum denied the claim. It claimed that the primary basis of Mr. Tucker's disability was ADHD, which had improved with medications.

42. That same day, in a phone call between Ms. Albert and Mr. Tucker, Mr. Tucker was upset and stated that Unum had looked at the wrong information. Although medications helped with his ADHD, it did not improve his memory.

43. With the assistance of his wife, Mr. Tucker submitted a *pro se* appeal on January 17, 2023.

Bias of Dane Street

44. Unum next retained Dane Street to review some of Mr. Tucker's medical records. It then relied on that review as a basis to deny Mr. Tucker's appeal. It is thus important to understand the connection between Unum and Dane Street to determine if evidence exists that would encourage reviews to help deny claims.

45. Mr. Tucker found an Administrative Services Agreement ("ASA") between Dane Street and Sedgwick, a third-party administrator with more than 21,000 employees that is found in 65 countries. In its ASA with Sedgwick, Dane Street promises that it can create Management Reports on a monthly and quarterly basis that list information for LTD claims. The reports track data on activity, performance, and outcome, including the ultimate outcome of the medical record review. While it might be valuable to understand the history and LTD claims, there

should be no tie-in between the medical record reviews that Dane Street provides and the insurance company's tracking of those disability claims.

46.    Dane Street provides this information so that an insurance company like Unum can track the result of every claim in which it retained Dane Street to provide a medical record review.

47.    Dane Street also encourages its insurance companies to share its services with their vendors. To encourage this, Dane Street pays the insurance company a "cooperative services payment" each year. In 2018, Dane Street paid Sedgwick $120,000 for the privilege of expanding its network to Sedgwick vendors. Dane Street knows that by paying for access to more employer plans, it can get more income from medical record reviews. It is boldly direct about its motives:

> 3.3    Marketing of the vendor's program to Sedgwick's clients in order to increase network penetration and savings

48.    Some call it a kickback, but it's been here for years.[1] Considering Dane Street's ASA with Sedgwick, the Unum-Dane Street ASA should reveal if Dane Street pays Unum similar kickbacks to "increase network penetration and savings".

49.    Dane Street can also provide a list of medical record reviewers who have previously provided reviews for insurance companies. It sends these reports to the insurance company to identify "repeat players" who were instrumental in helping deny disability claims.

---

[1] https://en.wikipedia.org/wiki/Mama_Said_Knock_You_Out_(song)

50. On information and belief, Dane Street has provided these reports to Unum in the past. Unum cannot object that it does not have these reports when Dane Street admits to creating them.

51. Dane Street's bias goes further. Courts have noted Dane Street's history of bias and that it is "known to render biased opinions on the ultimate issue of disability". This is done "to reduce benefit payouts, thereby satisfying their clients and resulting in increased profits for themselves". *Davidson v. Ascension Long-Term Disability Plan*, C.A. 4:17-cv-995 (E.D. Missouri, October 16, 2017).

52. Dane Street also provides its pricing guide for medical record reviews on a tiered flat fee schedule. The rates are revealing:

| Claim Type | Review Type | PA Type | Fee |
|---|---|---|---|
| STD | Physician Advisor Review/Consultation | | $225.00 |
| | Initial Physician Advisor Peer Review | | $275.00 |
| | Appeal Physician Advisor Peer Review | Tier 1 | $375.00 |
| | | Tier 2 Specialty[2] | $400.00 |
| | Multi-Specialty/Panel Review[3] | | Variable[4] |
| | Addendum Reports | | $75.00[5] |
| LTD | Physician Advisor Review/Consultation | | $295.00 |
| | Initial Physician Advisor Peer Review | | $395.00 |
| | Appeal Physician Advisor Peer Review | Tier 1 | $475.00 |
| | | Tier 2 Specialty[2] | $550.00 |
| | Multi-Specialty/Panel Review[3] | | Variable[4] |
| | Addendum Reports | | $75.00[5] |

53. Dane Street promises medical record review services at flat fee rates. Those rates are theoretically intended to reimburse the medical reviewer for the time spent

reviewing all the medical records, conducting telephone conferences with the treating physicians, and preparing a report. But the actual rates show that profit requires churning of massive number of files, which only come from finding that claimants are not disabled.

Unum Denies <em>Pro Se</em> Appeal

54.  The Dane Street reviewer claimed that Mr. Tucker could not be disabled because someone in his condition could not have prepared a *pro se* appeal.

55.  Unum sent a copy of the Dane Street medical review to Mr. Tucker.

56.  Mr. Tucker wrote to Unum on February 8 that he could not keep track of Unum's argument and that it was obvious that Unum using his impairment against him in the appeal process.

57.  Unum denied Mr. Tucker's *pro se* appeal on February 22, 2023.

Mr. Tucker Retains Counsel and Submits Appeal Supplement

58.  On June 6, 2023, Mr. Tucker submitted additional evidence in support of his claim. Among other things, he provided personal statements, a plethora of evidence of Unum's institutional bias, profit motives, depositions, and the Dane Street ASA documenting its bias.  The additional evidence was provided pursuant to Fifth Circuit case authority that obligated Unum to review the additional information. ("The administrative record consists of relevant information made available to the administrator prior to the . . . filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it".) *Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 300 (5th Cir. 1999). *Vega* has been repeatedly upheld by the 5th Circuit, most recently in *Ariana M. v. Humana Health Plan of Texas,*

*Inc.*, 884 F.3d 246 (5th Cir. 2018). Mr. Tucker asked Unum to review those records pursuant to its legal obligation and re-evaluate his claim.

59.  The evidence that Mr. Tucker sent in June 2023 was submitted before filing this lawsuit and in a manner that gave Unum a fair opportunity to consider it.

60.  Instead, in a series of letters on June 7-8, Unum claimed that it did not receive all the documents.

61.  After Mr. Tucker re-sent the evidence, he asked Unum if it would refuse to add the evidence to its claim file.

62.  The next day, Unum claimed that it added the evidence to the claim file, but that "no further appeal is warranted".

63.  Having exhausted his administrative remedies, Mark Tucker brings this action to recover the LTD benefits promised in the Plan and Policy.

**IV.**
**CLAIMS & CAUSES OF ACTION**

64.  The Electricity Reliability Council of Texas Plan claims to be governed by ERISA. 29 U.S.C. §1001, *et. seq*. ERCOT is the plan sponsor and Plan Administrator. Unum is the insurer and Claim Administrator under the Plan.

65.  As Plan fiduciaries, Unum and the Plan are obligated to handle claims for the benefit of the Plan and Plan beneficiaries, and to deliver the benefits promised in the Plan. They are also obligated as fiduciaries to conduct their investigation of a claim in a fair, objective, and evenhanded manner.

66.  Unum's adjustment of Mr. Tucker's claim was instead biased and outcome oriented. This was partly reflected by its denial of the claim, even after being

presented with evidence of his disability. It was also reflected in Unum's unreasonable reliance on reviewers who lacked the training, education, and experience to review his claim objectively or competently.

67. Unum's interpretation of the Plan was not legally correct. It was also contrary to a plain reading of the Plan language.

68. Unum's interpretation of the Plan and Plan language was contrary to that of the average Plan participant and policyholder. It was contrary to the common and ordinary usage of the Plan terms. Alternatively, the Policy language upon which Unum based its denial decision was ambiguous. The ambiguous nature of those terms requires that they be construed against Symetra and in favor of coverage for Mr. Tucker.

69. Unum's denial was made without substantial supporting evidence. Its decision to deny Mr. Tucker's claim was instead based upon rank speculation and guesswork. Unum's denial decision was *de novo* wrong. Alternatively, it was arbitrary and capricious.

70. The decision-making process did not comport with 29 U.S.C. §1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with the Department of Labor Regulations.

71. The decision-making process did not provide a reasonable opportunity to Mr. Tucker for a full and fair review of the decision denying the claim, as is required by 29 U.S.C. §1133 and 29 C.F.R. 2560.503-1.

72. The appellate procedures did not provide Mr. Tucker with a full and fair review.

73.  At all material times, Unum was acting on behalf of the Plan and in its own capacity as the Insurer and Claims Administrator.

74.  Unum's denial of Mr. Tucker's claim breached the Plan terms. This breach violated 29 U.S.C. §1132(a)(1), entitling Mr. Tucker to the LTD policy benefits to which he is entitled under the Plan, along with pre-judgment interest on the amounts due and unpaid, all for which he now sues.

## V.
## STANDARD OF REVIEW

75.  The default standard of review for denial of a benefit claim is *de novo*. Where the Plan or Policy confers discretion on the Claims Administrator, an abuse of discretion standard of review may apply.

76.  The Plan or Policy may contain a discretionary clause or language Unum may contend affords it discretion to determine eligibility for benefits, to interpret the Policy, and determine the facts. Unum's denial under this standard of review, if any, was an abuse of discretion. It was arbitrary and capricious.

77.  If discretion applies, the Court should afford Unum less deference considering its financial conflict of interest. Unum's conflict of interest is both structural and actual. Its structural conflict results from its dual role as the adjudicator of Mr. Tucker's claim and as the potential payor of that claim.

### History of Unum's Institutional Bias

78.  Unum's actual financial bias goes back decades.

79.  Starting in 1994, Provident, Paul Revere, Unum, and other companies conspired to reverse staggering financial losses incurred in the disability business by denying more claims. In the 1980s, disability insurers like Provident aggressively marketed

and sold "own occupation" policies, which insured individuals against disabilities from their own specific occupational specialties. As "preferred professional" policies, they commanded higher premiums, which could then be invested to earn substantial returns in an era of high interest rates.

80.  But in the 1990s, interest rates dropped, claims poured in, and insurance companies sustained heavy losses. Provident's losses were so severe that in December 1993, it took a $423 million charge to meet its anticipated future liabilities on claims arising from own-occupation policies. The CEO resigned and a new CEO named Harold Chandler was hired. Mr. Chandler came from banking and had essentially no background in insurance claims.

81.  Provident's Senior Vice President of Risk Management, Tom Heys, in a confidential memo, explained the problem was that Provident sold policies without regard to the claims it would ultimately need to pay. He wrote:

> The . . . 1980s were characterized by a highly competitive, growth-oriented market environment. Product provisions and underwriting were liberalized . . . as . . . competitors . . . attempted to grow share. The product sold . . . can neither be canceled nor its price raised, covering the own occupation of the individual . . .
>
> In hindsight, it is generally viewed that the policies sold during the period were poorly underwritten and underpriced. This was common among competitors, but Provident seems to have taken it a few steps further. Provident in many cases, won the market share battle and, in fact, was very successful in certain high population growth states, such as California . . . Provident was also slow to recognize that deteriorating experience on this block of business in terms of taking early action. As a result, it is felt that, as other companies were tightening their offerings, many of the poor risks went to Provident.

82.  In its 1993 10-K amended financial report filed with the SEC, Provident explained that it underestimated its exposure on "own occupation" policies, it could no longer obtain high investment returns on its premiums, and one of the principal solutions

was to "improve claim handling procedures." Mr. Heys described Provident's claims department as being engulfed in a "crisis atmosphere" due to the "continuing high level of new claims."

83.    In response to this "crisis," Provident undertook a deliberate plan to lower its claim payments by denying more claims. To do so, it developed practices and procedures that had the specific goal of denying more claims. The engineer of this scheme was Provident's new Senior Vice President of Claims, Ralph Mohney, who was appointed in 1994 by Provident's CEO, Harold Chandler. Chandler and Mohney set about to "tighten up the claims-paying process." Mohney admits that he did not know how to process a disability insurance claim, only 25 years of experience in Provident's financial departments.

84.    He developed 10 disability claims "performance objectives." The first objective was to increase the number of claim "terminations." Mohney measured the volume of terminations by the amount of reserves that Provident could eliminate from its books through claim terminations.[2] Thus, Mohney's response to more new claims was simple: "deny even more claims." To accomplish these nefarious goals, he created a ten-point "Claim Improvement Initiatives" memo. Mohney had high expectations of the money he could save Provident. In a May 1995 memo to CEO

[2] A "reserve" is an estimate of the amount the company must pay in the future for that claim. Mohney used a "ratio" created by the total amount of claim reserves which would be eliminated through claim terminations divided by the amount of reserves associated with new claims (the "net termination ratio"). For example, if Provident terminated 10 claims with reserves of $100,000 each, the termination number would be $1,000,000. If 12 new claims arose in the same period, each with a $100,000 reserve, the new claims reserve would be $1,200,000. Thus, the net termination ratio would be $1,000,000/$1,200,000, or 83%. Mohney testified that the higher the net termination ratio, the less Provident had to pay in claims. Thus, he wanted to offset each new claim coming in with a corresponding denial of an existing claim. Because the claims department could not affect new claim reserves, the only way to increase the net termination ratio was to increase the reserves Provident saved by terminating claims. Thus, Provident had an incentive to terminate the claims with the largest reserves.

Chandler, he reported that "a number of claim improvement initiatives have been identified and are currently being implemented. . .We believe that aggregate improvements in the 5% – 10% ($30 million – $60 million annually) range are possible "once the initiatives have been fully implemented." Mohney's superior, Heys, reported to Chandler that **"we have a good chance of meeting our goal of $132 million of terminations for the quarter"** and **"terminations should be much stronger . . . We have a good shot at making our goal, which is 10% above last year."**

85.    Mohney exceeded expectations. In the following months and years, Mohney submitted reports to his superiors of his success at denying more claims. His monthly reports described the "favorable," "highly favorable," and "unfavorable" results, depending on the level of terminations. For example, a typical Mohney report read, "Claim results were highly favorable in October . . . Terminations reached $45.1 million, the highest level ever for non-scrub months and 9% above the average." Mohney's superior reported to the president of the company: "Claim terminations[3] in May were $41 million, which is the highest they have ever been in a non-scrub month." "We will have a good quarter in DI [disability insurance] terminations. Continued institutionalization of claim management practices is reflected in the numbers."

86.    By 1998, Provident had successfully reversed its losses. It became the biggest disability insurer in North America and was looking to get bigger. Provident's

---

[3] Mohney changed from using the phrase "terminations" and began using the more palatable-sounding term, "resolutions." They mean the same thing.

March 31, 1998 10-Q attributed its rising profits directly to Mohney's claims initiatives.

87. These claims initiatives included more "independent medical examinations", the development of a "network" of IME physicians who specialized in "forensics" instead of physicians with an actual clinical practice, and the direct targeting of claims from own occupation policies and claims from physicians.[4] Special units, like the psychiatric claims units, orthopedic claims units, cardiac claims units, cancer claims units, and general medical claims units, were created to handle specific claims. These units were supposed to develop specialized techniques uniquely suited to the management of these claims, and the members of these units would specialize in the specific types of injuries and sicknesses presented. Instead, consultants were hired to supervise the claims people and in-house medical doctors were hired. According to testimony and evidence, these consultants and medical advisors were trained to look for ways to deny claims. Many of the in-house medical doctors have stock options and other benefits tied to the profitability of the insurance company, giving them an incentive to deny claims.

88. Another Provident initiative was to "sharpen [its] legal defense" (in other words, paper the file or eliminate paper from the files) in cases with "bad faith/punitive liability in high exposure states" like Texas. However, Provident did not want to spend too much money on denying claims. Its goal was to limit the expenditure on claims to 2% of the reserves it saved through the termination. One of the most

---

[4] These claims were identified as "known problem areas" and "poorly performing cells."

effective tools used by Provident was its weekly "roundtable meetings". Each claims adjuster was required to bring matters to the roundtable meeting, but no notes exist as to what happened during these meetings.

89.    These roundtable meetings, however, were intended to accomplish one purpose - the termination of an ongoing disability claim, and thus the saving of reserves. Dr. William Feist was on the medical staff of Provident for 14 years. In 1995, he was its Medical Director. He sat in on the weekly roundtable meetings. Almost every claim that came before the roundtable had high reserve amounts. Dr. Feist was shocked and appalled by what transpired at these roundtable meetings. There was no effort to fairly evaluate the cases. The sole object of these meetings was to find a way to terminate a claim.

Provident Infects Paul Revere

90.    In 1996, Provident acquired Paul Revere for $1.2 Billion.[5] It immediately began implementing its claims initiatives at Paul Revere's Worcester, MA office. Provident created a task force to ensure the successful implementation of the initiatives. The task force created a timetable for adoption of Provident's claims handling protocols, such as the roundtable reviews and the creation of a special unit to handle psychiatric claims.

91.    Provident trained Worcester medical personnel to help deny claims. They were instructed how to "challenge certification" - to disagree with a treating physician that his patient is disabled. Even if the adjuster with the treating physician's conclusion that an insured was disabled, they were not allowed to write that

---

[5] https://www.nytimes.com/1996/04/30/business/provident-agrees-to-acquire-paul-revere-for-1.2-billion.html

conclusion in the file.[6] Instead, they were instructed to focus on whether appropriate treatment was being pursued and when the insured might be able to return to work. Provident implemented various "performance measures" for the Worcester claims office, and monitored the number of IME's, surveillance, and roundtable reviews, as well as Mohney's net termination ratio.

92.    Provident sent Jeff McCall, the author of the ERISA memo, to Worcester to oversee the psychiatric unit. One of McCall's first mandates was to subject all-new high exposure claims to roundtable review and to track the number and dollar amount of claims terminated due to roundtable. The focus on money sunk to new lows. Each adjuster was required to submit a "hit list" a running list of claims that were projected for closure in the coming months, along with the amount of reserves held on those claims.

93.    As with Provident's Chattanooga office, the initiative worked. In his monthly reports, Mohney tracked the "key activities" in the Worcester office, including the quarterly dollar amount of terminations, and the reserves released because of roundtable reviews. In his March 23, 1998 report, Mohney reported that February's claim results in Worcester were "highly favorable" and "resolutions were up roughly $3 million above the 1997 average."

Unum Acquires Provident's Methods

94.    In 1999, Provident merged with Unum Life Insurance Company to become UnumProvident, the largest disability insurer in the country. Ralph Mohney

---

[6] Mohney reprimanded Dr. Feist for doing so.

became the head of Unum's claims department and instituted his culture of denying claims throughout the company. Dr. Patrick McSharry was an in-house consultant hired to work in the Chattanooga claims department. He reviewed claim files throughout the country. He reported to Dr. Robert Anfield, medical director of all Unum in-house consultants. He testified that the procedures in Chattanooga were the same throughout Unum.

95.    In a deposition, Dr. McSharry described a company-wide practice designed to deny claims. The claims department was broken down into specific units. Each unit in the claims department had monthly and quarterly denial target numbers to meet. The numbers consisted of the total reserves that would be taken off the books upon the denial of claims and resulting in savings for Unum. A unit reached its numbers by denying claims with reserves totaling the target numbers for the month or quarter. As the month or quarter ended, there was intense pressure on the claims units to deny claims to meet these targets. The claims persons who denied the most reserves in claims were seen as the "top producers". Those units that did not meet their numbers were viewed unfavorably by claim executives. Sometimes at the end of a month or quarter, the claims people would be required to come to work on Saturday to get enough claims closed to meet the target numbers. Dr. McSharry produced an example of a hit list of claims targeted for denial at his deposition.

96.    Because the general medical team had monthly target closures of $2.5 Million to $5 Million, there was a lot of pressure on claims handlers to close claims. Unum's roundtables were a raucous affair, with claim handlers yelling, "Close the claim! Close the claim!" Dr. McSharry would respond by making a slashing motion across his throat, indicating the expression, "Cut them off". Kim Boles, a senior claims

specialist, would put her hands to her throat and yell, "Cut them off!" in mini-round table meetings.[7] Dr. McSharry explained that the role of in-house medical consultants was to write reports so that claims personnel could deny claims. Indeed, the claims personnel were the "business partners" of the in-house staff.

97.    Medical consultants were not to provide independent evaluations. Instead, they were given a bonus and stock option incentives tied to Unum's profitability; their job was to make their "business partners" happy by supporting denials and enabling them to meet their target numbers. Dr. McSharry was repeatedly criticized for expressing his actual opinion instead of opinions that the claims department wanted to hear. He described a claims department that had a policy to deny claims by any means necessary.

98.    Unum outlined its compensation plan in a series of documents. In April 2002, UnumProvident prepared its Management Incentive Compensation Plan and Performance Management Plan ("2002 Compensation Plan"). The 2002 Compensation Plan outlined that minimum company earning thresholds had to be met for award eligibility. At least 50% of performance was based on Return on Equity.

99.    To meet these goals, Unum claims handlers would "advance pay and close", closing claims based on a hypothetical ramp up of hours that an insured was supposedly able to do in his profession. Because the insured had no right of appeal and was not notified in advance, the insured would be subject to higher scrutiny and misled into agreeing to take an advance pay and close.

---

[7] This is different from the phony roundtables Unum would hold when taking clients on guided tours of its building.

Unum's Institutional Bias Manifests in LTD Claims

100.  Throughout this claim, Unum's hostile approach has been clear. One example is its extensive use of its own medical directors to review some of Mr. Tucker's medical records. These medical directors are Unum employees. None of them ever spoke with Mr. Tucker or physically examined him. They are compensated in a manner designed to encourage them to deny claims, rather than fully and fairly review claims. This underlies a far greater problem - Unum treats its long-term disability claims department as an ongoing source of revenue.

101.  Unfortunately, this is not surprising. Unum was the subject of substantial criticism and review in 2002-2004 for improper claims handling processes. A Multistate Market Conduct Examination was performed "to determine if Unum's disability income claims handling practices reflected systemic unfair claim settlement practices in violation of state laws governing the insurance industry.

102.  After conducting a review of Unum's files, the multistate examination identified the following areas of concern:

    a.  Excessive reliance upon in-house medical professionals;
    b.  Unfair construction of attending physician or IME reports;
    c.  Failure to evaluate the totality of the claimant's medical condition; and
    d.  Inappropriate burden placed on claimants to justify eligibility for benefits. . . in which benefits were denied by the Companies on the grounds that the claimant had failed to provide "objective evidence" of a disabling condition.

103.  The multistate investigation was resolved in November 2004. Unum agreed to comply with the terms of a Regulatory Settlement Agreement ("RSA") which required, among other things, that Unum increase its use of IMEs rather than relying so heavily on the opinions of its own employees. It failed to do so.

Unum Employee Scorecards and Incentive Plans

104.    In 2005, after the RSA was created, Unum created a Performance Based Incentive

Plan ("PBI") that it has since worked diligently to keep secret. The PBI has been

"further developed, modified and refined over time." Thanks to the work of brave

lawyers around the country, much is now public record. The 2005 UnumProvident

Manager Toolkit ("2005 Toolkit"), for instance, documents the PBI. Unum

outlined its business priority to give "attractive financial returns" to its owners. It

created a Balanced Business Scorecard with targets for categories like:

| | | |
|---|---|---|
| 1. | Appeals Rate | what % of claims should be appealed |
| 2. | Appeals Upheld Rate | what % of appeals should be denied |
| 3. | New Litigation Rate | what % of claims should reach litigation |
| 4. | Reopen Rate | what % of claims should be reopened |

105.    For instance, the target appeals rate for LTD claims was 10-14%. The target appeals

upheld rate was 80-85%. This meant that Unum expected only 10-14% on denied

claims to be appealed. Unum expected 80-85% of appeals to be denied. Of the

appeals denied, Unum expected less than 1.5% to get into litigation. With these

targets, Unum aligned its employees' goals to "share in the company's success

through the PBI".

106.    Unum created a fixed pool for bonuses, in which one department's performance

above target would reduce the other departments' bonus pool by that same

amount. This created a race to the bottom as employees rushed to deny claims and

appeals to meet these financial targets. Managers were assigned to "help

employees line their performance plans with the business unit and company plan".

107.    Although Unum claims that it no longer uses such a program, the evidence shows

otherwise. The Unum Stock Incentive Plan of 2012 governs awards of common

stock and incentive stock options for Unum employees based on performance goals, including loss ratio and earnings, among other measures. A Committee is designated to administer the Plan and determine who gets the awards, the number of shares included in each award, and the terms and conditions of each award. Stock option and stock appreciation rights may be granted up to 1.2 million shares per year. Employment termination results in a penalty of requiring redemption of incentive stock options within 90 days of termination.

108. The 2015 Unum Annual Incentive Plan's goal is "to motivate the participants to perform in a way that will enable the Company to reach or exceed its goals". As before, the Plan is based on the achievement of objectively determinable performance goals measured over 12 months. A Compensation Committee has the authority to establish goals and target awards and increase, reduce, or eliminate cash incentive awards. It can also pay other additional amounts or compensation to employees. For the incentive (cash bonus based on percentage of salary or range of dollar amounts) award, the Committee can reduce it for failing to meet financial or other economic goals. It can also adjust the performance goals for incentive awards to "mitigate...the impact...of losses". In other words, if too many claims are paid, the Committee can adjust goals to offset those "losses".

109. Additional information and context to the 2015 Annual Incentive Plan is found in Unum's 2015 Proxy Statement. Annual incentive awards are created to motivate employees to achieve short-term corporate goals and individual objectives. This compensation is paid in cash. Long-term incentive awards are designed to motivate long-term performance and align the interests of management and stockholders. This compensation is awarded in restricted stock units and

performance share units (PSUs) based on a corporate earnings threshold and individual performance.[8] However, neither the short term nor long term incentives are paid unless Unum achieves a specified level of performance. For 2014, the Compensation Committee established a $250 Million earning target performance requirement.

110. The 2015 Annual Incentive Plan and Proxy Statement prove that Unum continues to award cash bonuses and stock options based primarily on corporate profit objectives. The requirement of mandatory stock ownership means that Unum Medical Directors, who are senior officers, are conducting claim reviews, knowing that their decision also impacts their own pocketbook.

111. Unum's approach has remained consistent. In 2018, Unum's PBI encouraged Unum employees to focus on "business value" and to think "with the mindset of a business owner" who is interested in "strong stewardship of the Company's financial resources". Employees are expected to support all business initiatives. Employee bonuses are capped at $8M.

112. Unum creates various weekly reports that track its directors' progress in closing claims, which it refers to as "recoveries". The weekly reports also compare the progress to a plan made by the finance department. The weekly reports give the director a projection of closing claims through the end of the month and tell the director if he or she is ahead or behind the plan. Directors are expected to know their progress, which is discussed in weekly meetings. Put another way, Unum

---

[8] Senior Unum officers are required to keep a fixed percentage of shares for a specified period.

evaluates the performance of its directors based, at least in part, on the number of claims that they deny.[9]

113.    Each of these grounds was a motive to deny Plaintiff's claim, along with the delay in payment or denial of claims of other Unum policyholders and claimants.

114.    Considering its financial conflict, Unum should be given little or no discretion in its claim decision.

## VI.
## REQUEST FOR PREJUDGMENT INTEREST & AN ACCOUNTING

115.    Mr. Tucker requests, in addition to the benefits withheld, prejudgment interest on any such award. He is entitled to prejudgment interest as additional compensation, and pursuant to Texas Insurance Code Sec. 1103.104, or on principles of equity.

116.    The Plan and Policy do not contain a rate of interest payable on the benefit amount wrongfully withheld. Resort must be had to Sec. 1103.104(c) of the Texas Insurance Code.

117.    ERISA plaintiffs are authorized to obtain pre-judgment interest when calculating the total compensation amount for their claims. *Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016) ("Prejudgment interest is available in ERISA cases."); *Whitfield v. Lindemann*, 853 F.2d 1298, 1306 (5th Cir. 1988) ("It is not awarded as a penalty, but of as compensation for use of the funds."). Pre-judgment interest furthers ERISA's purpose. *City Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, (1995) (The "essential rationale for awarding pre-judgment interest is to ensure that an injured party is fully compensated for its loss.").

---

[9] See the January 24, 2020 deposition of Unum Assistant Vice President Marianne Justin.

118. Because ERISA does not mandate a rate for pre-judgment interest, state law determines the applicable interest rate. *Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016). In the alternative to the Texas Insurance Code, pre-judgment interest may be calculated under Texas Finance Code Ch. 304. *Arete Partners, LP v. Gunnerman*, 643 F.3d 410, 414-15, (5th Cir. 2011). Accrual of interest starts on (1) the 180th day after a defendant receives written notice of claim or (2) the date suit is filed, whichever is earlier. Tex. Fin. Code Ann. §304.003(c), 304.104. Accrual of interest ends on the day preceding the judgment, at the prime rate of 5% per year if the prime rate if less than 5%. *Id.*

119. Mr. Tucker requests an accounting to determine the amount earned on the funds that should have rightfully been paid to him, and in accordance with Insurance Code Sec. 1103.104(c).

## VII.
## CLAIM FOR ATTORNEYS FEES & COSTS

120. Mr. Tucker seeks an award for his reasonable attorneys' fees incurred and to be incurred in the prosecution of this claim for benefits. He is entitled to recover those fees, together with his costs of court, pursuant to 29 U.S.C. §1132(g).

121. The court may award attorneys' fees when it "can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry". *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010).

## VIII.
## PRAYER

Mark Tucker, Plaintiff, respectfully prays that upon trial of this matter or other final disposition, this Court find in his favor and against Defendant Unum Life Insurance Company of America, and issue judgment against it as follows:

A.    Pay to Mr. Tucker all benefits due and owing in accordance with the terms of the Plan and Policy, as well as all prejudgment interest due thereon and as allowed by law and equitable principles;

B.    Pay all reasonable attorney's fees incurred and to be incurred by Mr. Tucker in obtaining the relief sought herein, along with the costs associated with the prosecution of this matter; and

C.    All such other relief, whether at law or in equity, to which Mr. Tucker may show himself justly entitled.


Respectfully submitted,


By:_____*/s/ Amar Raval*_____
        Amar Raval, TBA #24046682
        S.D. No. 619209
        Berg Plummer Johnson & Raval LLP
        3700 Buffalo Speedway, Suite 1150
        Houston, TX 77098
        (713) 526-0200
        (832) 615-2665 (Fax)
        araval@bergplummer.com

        ATTORNEYS FOR PLAINTIFF